```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

SST CASTINGS, INC.,                :
                                   :   NO. 1:02-CV-00592
    Plaintiff,                     :
                                   :   **OPINION AND ORDER**
  v.                               :
                                   :
AMANA APPLIANCES, INC.,            :
                                   :
    Defendant.                     :

        This matter is before the Court on the Defendant Maytag Corporation d/b/a Searcy Laundry Products' (hereinafter "Maytag"), Combined Motion for Leave to File Motion for Partial Summary Judgment and Brief Extension of the Trial Date (doc. 64), the Response of Plaintiff SST Castings, Inc. (hereinafter "SST") to the Motion for Leave to File Motion for Partial Summary Judgment of Maytag (doc. 66), Maytag's Memorandum in Support of Combined Motion for Leave to File Motion for Partial Summary Judgment and Brief Extension of the Trial Date (doc. 67), SST's Notice of Filing Supplemental Authority (doc. 70), Maytag's Motion for Reconsideration (doc. 73), and SST's Response to Maytag's Motion for Reconsideration (doc. 74).

**PROCEDURAL HISTORY & FACTS**

    **A.  Procedural History**

        On July 11, 2002, SST filed this action in the Hamilton County Court of Common Pleas (doc. 1).  Maytag filed its

Notice of Removal to this Court on August 13, 2002 (Id.) and filed its answer to SST's Complaint on September 9, 2002 (doc. 12). On August 20, 2002, SST moved the Court to disqualify Maytag's counsel, in part based upon an alleged former and current client relationship with SST (doc. 4). On October 18, 2002, the Court denied SST's Motion to Disqualify in its entirety (doc. 31).

On March 14, 2003, Maytag filed its first Motion for Summary Judgment (doc. 40) and on April 2, 2004, SST filed its Response to Maytag's first Motion for Summary Judgment as well as a Cross-Motion for Summary Judgment (doc. 42). On December 2, 2003 the Court granted in part Maytag's Motion for Summary Judgment and denied SST's Cross-Motion for Summary Judgment (doc. 49). As a result of the Court's Order, the only claim remaining for trial was SST's breach of contract claim (Id.). On June 11, 2004, SST sought leave to file an Amended Complaint (doc. 54). The Court granted said Motion (doc. 56).

In SST's Amended Complaint, it asserted a new state claim for fraudulent inducement and "clarified" its breach of contract claim (doc. 59). The Court in its Order granting SST's Motion for Leave to File an Amended Complaint, set a three-day jury trial for November 23, 2004 (doc. 57). Both Parties, subsequently, filed a Joint Motion to Continue the Trial Date (doc. 60), which was granted by the Court (doc. 61). The trial was reset to December 14, 2004 (Id.). On December 8, 2004 the Court granted

Maytag's Motion for Brief Extension of Trial Date, noting that upon its ruling of Maytag's Motion for Partial Summary Judgment that a new date for trial would be set (doc. 72).

**B. Facts**

The Court recites the facts as enunciated in its "Background" section found in an earlier Order (doc. 49). In simplest terms, SST's initial Complaint was grounded in the theory that it had a requirements contract with Maytag to provide specially-manufactured castings for washing machines (doc. 1). SST alleges that Maytag breached the contract in favor of another manufacturer that offered a cheaper price, and left SST with a large number of castings now stored in China and in Ohio (Id.).

The basic facts of this case are as follows. In 1999, Brian Fields (hereinafter "Fields), SST Account Manager, contacted Maytag to determine Maytag's interest in purchasing bearings and castings (docs. 40 and 42). Such discussions specifically concerned washtub hub castings for Maytag washing machines (Id.). After meetings and communications, Fields asked that Maytag permit him to present a price quotation for the castings (Id.). In order to calculate the price quote, Fields requested an estimated annual quantity, and Maytag responded that its approximate annual quantity was 200,000 units (Id.).

On May 25, 2000, SST prepared its price quotation (docs. 40 and 42). SST asserts that such price quotation was an offer to sell Maytag 200,000 custom castings (doc. 40). In

contrast, Maytag contends that the price quote constituted an invitation for it to make an offer rather than an offer, or in the alternative, an offer that expired within a set time (doc. 42). The price quote indicated a unit price of $3.39, tooling price of $19,000, the casting material, casting weight, an annual quantity of 200,000 units, and included language that it would be valid for sixty days (docs. 40 and 42). The price quote also stated that the country of origin for the castings was China, and subsequent deliveries would be just-in-time ("JIT") from inspected inventories held in Ohio.

In November 2000, Maytag requested that SST provide sample castings (docs. 40 and 42). As a result of such request, SST in turn requested its foreign supplier to obtain the appropriate tooling and produce approximately forty castings (Id.). The tooling price was $19,000, the same amount established in the May 25, 2000 quotation. Maytag required a pilot run of 1,600 units to further test the compatibility of the castings with its product (Id.).[1]

On May 22, 2001, Maytag issued a Blanket Purchase Order (hereinafter, "BPO") to SST (docs. 40 and 42). The purchase order provided that it was "to cover quantities scheduled and

---

[1] Although Defendant's initial Motion for Summary Judgment (doc. 40) references purchase order R03502 that states the unit price was $5.02 for the 1,600 units, Fields testified in his deposition that SST viewed this as an error and SST actually billed Maytag $3.39 for each unit in the pilot run.

shipped as released..." (Id.).[2]  In addition, the BPO contained the following language:

> By shipping the above goods or by acknowledging receipt of this order or by performing the above described, supplier agrees to the terms and conditions of sale set forth on the face hereof. Any different or additional terms in your acceptance of this offer are hereby objected to.

(Id.).

Plaintiff alleges that it only received a one-sided document in regard to the BPO (doc. 42). Maytag contends that the back of the Order reads:

> ENTIRE AGREEMENT: This order and any documents referred to on its face thereof constitute the entire agreement between the parties. It may not be modified or explained except in writing. . . No part of this Order may be assigned or subcontracted without written approval. . . The terms of this Order will be governed by the laws of the State of Iowa.

(doc. 40).

On the same day that the BPO was issued, Maytag concurrently sent its first release requesting 4,800 castings to be delivered on August 13, 2001 (doc. 40). The release contained language that made it subject to all terms and conditions of the BPO (Id.). In response to this notice from Maytag, SST contacted its foreign supplier and ordered 200,000 units, Maytag's yearly estimated quantity based on the discussions leading up to the May 25, 2000 price quote (doc. 42). During the next few months, Maytag

---

[2] Additionally, the quantity column of the BPO states "to be released" (Id.).

issued various releases to SST indicating specific quantities and specific release dates (docs. 40 and 42).  However, on October 16, 2001, Maytag cancelled previous releases for 21,000 castings, and on November 28, 2001, cancelled another release of 4,800 castings (doc. 42).

Also on November 28, 2001, Maytag issued its last release to SST (doc. 40).  Plaintiff signals that on this last release, Maytag's Purchasing Manager, Jeff Galyan, wrote "These were last requirements that we received" (Id.).  By that time, Maytag had released 79,700 castings, with the last quantity of 7,000 castings due on or before January 10, 2002 ( Id.).  Maytag asserts that it paid for all released, shipped and invoiced castings (Id.).  SST contests such assertion, based on the fact that on March 20, 2002, Maytag returned 7,000 castings that it had previously released without payment (doc. 42).  SST states that combined with the cancelled orders made under the BPO, there is a total of 32,800 castings for which it is entitled to payment, plus five percent of costs, pursuant to the terms on the second page of the BPO (Id.).

After Maytag stopped issuing releases, Fields contacted Maytag (Id.).  Maytag indicated at this time that it had decided to discontinue the relationship ( Id.).  In response, SST quoted a lower price, that Maytag refused, opting instead to purchase from a different supplier (Id.).  The parties commenced negotiations about the remaining 94,533 castings that SST alleged were held in inventory in Ohio and China, but were unsuccessful

-6-

(Id.). In SST's Amended Complaint, it further alleges, that Maytag never intended to fully perform its obligations under the contract and instead intended to (1) breach the contract with SST once the quality of castings from the new supplier could be established and (2) commence purchasing castings from the new supplier at that point (doc. 54).

In the final computation, Maytag obtained 124,650 castings from its new supplier and about 81,000 castings from SST, for a total amount just exceeding the original annual estimated need of 200,000 units (Id.).  SST argues that it mitigated damages by stopping further production of castings by its foreign supplier (Id.).  SST asserts lost profits of $23,739 in addition to a larger sum for the castings held in inventory (Id.).

As noted above, the Court granted in part Maytag's first Motion for Summary Judgment leaving only one claim - that being, a claim for breach of contract (doc. 49).  The Court held that a reasonable jury could find in favor of SST's allegation that a requirements contract was entered and that Maytag breached said requirements contract (Id.).  SST's added claim, found in its Amended Complaint, is one of fraudulent inducement (doc. 59).  SST maintains that it relied upon Maytag's material representations to enter into the requirements contract and took steps pursuant thereto, including various costs and ordering goods from its supplier (Id.).  SST avers that Maytag made these representations with knowledge or utter disregard and recklessness to their truth

or falsity with the intent to mislead SST into reliance (Id.). Having justifiably relied upon these representations, SST claims it suffered damages in excess of $278,000 (Id.). SST also prays for interest on this amount as well as punitive damages (Id.).

**APPLICABLE LEGAL STANDARD: MOTION FOR SUMMARY JUDGMENT**

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992)(per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir.1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes

upon the movant and the non-movant are well settled.  First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).  The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case.  See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact.  See Celotex, 477 U.S. 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48 (emphasis added);

see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir.1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir.1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989)(internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991).

**MAYTAG'S COMBINED MOTION for LEAVE to FILE MOTION for PARTIAL SUMMARY JUDGMENT and BRIEF EXTENSION of the TRIAL DATE (doc. 64)**

The Court will address two preliminary matters. First, the Court grants Maytag's Motion for Leave to File a Motion for Summary Judgment (doc. 64). Having done so, the Court will now analyze Maytag's Motion for Summary Judgment, SST's Response, and Maytag's Reply (doc. 64, 66, and 67). Second, the Court notes that in its earlier Order granting in part Maytag's Motion for Summary Judgment, a discussion of what jurisdiction's law applies in this case was provided (doc. 49). As to this issue, the Court stated:

> It is unclear that Iowa's adoption of the Uniform Commercial Code (hereinafter "UCC") or its subsequent interpretation by Iowa courts differs in any relevant respect from that of

> Ohio or other jurisdiction.  See Iowa Code § 554, Ohio Rev. Code § 1302.  As such, the Court will analyze the Parties' positions in light of precedent generally interpreting the UCC, which the Court finds applicable in the event that either Ohio or Iowa law ultimately controls.

Id.  Having addressed these two preliminary issues, the Court now now turns to the Parties' arguments.

Maytag argues that SST's fraudulent inducement claim should fail as a matter of law because it made no false representations, it had no fraudulent intent at the time of the alleged representations, and SST has no evidence to the contrary (doc. 64).  SST replies that genuine issues of material fact do exist in this case, which have already been presented to the Court via SST's previous Motion for Summary Judgment (doc. 42) and Leave to Amend (doc. 54) that lead to the reasonable inference that Maytag entered into a requirements contract with SST without an intention to perform and thereby committed fraud upon SST (doc. 66).  SST notes that this Court must view all submitted evidence, facts, and reasonable inferences in its favor.  See Matsushita at 587.

The Sixth Circuit, interpreting Ohio law, has stated the following necessary elements to establish a claim of fraudulent inducement:

> (1) a representation, or where there is a duty to disclose, a concealment of fact;
> (2) which is material in nature;
> (3) [which] was made falsely with knowledge of its

> falsity or with utter disregard or recklessness as to whether it is true or false that knowledge may be inferred;
> (4) with the intent of misleading another to rely upon said misrepresentation or concealment;
> (5) which results in justifiable reliance upon that representation or concealment; and
> (6) proximately caus[es] some injury

Glazer v. Lehman Bros., Inc., 394 F.3d 444 (6th Cir. 2005) citing Davis v. Sun Ref. & Mktg. Co., 671 N.E.2d 1049, 1058 (Ohio 1996). SST maintains that Maytag, by issuing the BPO in response to its price quotation, promised that it would purchase its annual requirements of castings (approximately 200,000) from SST (doc. 66). SST argues that Maytag never intended to fulfill the terms of the requirements contracts (Id.). Instead, asserts SST, Maytag planned on cancelling the deal with SST as soon as a quality product from another, lower-priced supplier became available (Id.). When Maytag did find a lower-priced, quality product from another manufacturer, SST was left with thousands of unmarketable, customized castings in its inventory that were earmarked for sale to Maytag (Id.).

SST argues that Maytag ignores a number of relevant facts and inferences in asserting that it did not fraudulently induce it to enter into the contract (Id.). These include:

> (1) the fact that the Court, in its earlier Order (doc. 49), found that the SST's price quotation, dated May 25, 2000, constituted an offer that "was sufficiently detailed so as to reasonably appear that assent to its terms would create a binding contract" - thus, SST asserts, that this price quotation, as a matter of law, was an offer from SST to purchase 200,000 castings (doc.

67);

(2) the price quotation explicitly states that it concerns an "annual quantity" of 200,000 castings with a price of $3.39 per casting;

(3) Maytag acted consistently with the terms of the price quotation, including ordering tooling at the price indicated, ordering samples consistent with the parts identified in the price quotation, and ultimately accepting the offer by issuing a BPO to SST;

(4) the BPO indicated the exact price found on the price quotation - specifically, $3.39 per casting;

(5) that after issuing the BPO, Maytag continued to lead SST to believe that Maytag was operating pursuant to the terms of the price quotation;

(6) the releases issued by Maytag all referred back to the BPO by number and kept a running tally of the castings released to date on that BPO;

(7) often Maytag, advanced the dates of the releases, as Maytag expected SST to have such castings in inventory and be able to provide the goods upon issuance of Maytag's releases;

(8) the BPO created an obligation upon SST to provide Maytag with castings after releases were issued by Maytag

(9) when Maytag violated its contract with SST, leaving it with over $300,000 worth of customized castings, Maytag initially stated that it ceased issuing releases due to quality problems with SST's castings; however, Maytag later changed its story revealing that its transactions with SST ceased due to a lower price offered by another supplier;

(Id.). These facts, argues SST, lead to the reasonable inference that Maytag intended to "lull SST into a false sense of security" that it would purchase its annual requirements of castings from SST (Id.).

-14-

The Court is persuaded by SST's arguments. Material issues of fact exist that could lead the trier of fact to find that Maytag fraudulently induced SST to enter into a requirements contract while never intending to fulfill the terms of the contract. Paramount in this conclusion is: (1) the Court's earlier determination that the existence of a requirements contract is one best left to the determination of a jury and (2) SST's allegation that when it confronted Maytag about purchasing its remaining inventory (post breach of contract), Maytag lied asserting that it ceased ordering castings due to quality issues with SST's castings (Id.). However, SST avers that subsequently, Maytag admitted that in actuality it quit purchasing castings from SST because it had secured similar quality castings at a reduced cost from another supplier (Id.). SST avows that Maytag secretly arranged to purchase these lower priced castings from the other supplier before the BPO to SST was even issued (Id.). If these assertions are determined true - namely, Maytag's lies and attempts at cover-up - a reasonable inference could be drawn pointing to Maytag's fraudulent intent.

Oral or written communications are not required to find misrepresentation sufficient to constitute fraud under Ohio law (Davidson v. Hayes, 590 N.E.2d 18 (Ohio App. 1990) ("[a] false representation may be made by conduct calculated to and intended to produce false impressions . . ."). A reasonable trier of fact

could find that Maytag represented to SST that it intended to enter into a requirements contract - this issue was thoroughly analyzed in the Court's earlier Order (doc. 49). If Maytag made such a representation, that representation undoubtedly is material. SST's allegations concerning Maytag's lies and attempt at cover-up could reasonably lead a jury to conclude that the representation to enter into the requirements contract "was made falsely with knowledge of its falsity or with utter disregard or recklessness as to whether it [was] true or false" with the "intent to mislead" SST. Glazer, 394 F.3d 444 (6th Cir. 2005). SST's reliance upon such representations was arguably justifiable and it is not disputed that injury resulted. As such, Maytag has failed to demonstrate "that there is no genuine issue as to any material fact and that . . . [it] is entitled to a judgment as a matter of law."

**MAYTAG'S MOTION FOR RECONSIDERATION (doc. 73)**

Maytag moves the Court to reconsider its earlier Order (doc. 49) denying Maytag's Motion for Summary Judgment as to SST's breach of contract claim (doc. 73). Maytag maintains that the Sixth Circuit's decision in Advanced Plastics Corp. v. White Consol. Indus., 47 F.3d 1167 (Table), 1995 Westlaw 19379 (6th Cir. Jan. 18, 1995) stands as the basis for moving this Court to reconsider (doc. 73). SST has filed a Memorandum in Opposition to Maytag's Motion for Reconsideration (doc. 74).

Maytag maintains that the facts of Advanced Plastics

are identical in all material respects to the facts in the instant matter (doc. 73). SST, however, asserts that the facts in <u>Advanced Plastics</u> are not identical in all material respects to the facts here (doc. 74). In <u>Advanced Plastics</u>, Advanced Plastics manufactured plastic refrigerator parts for White Consolidated. <u>Advanced Plastics</u> at *1. White Consolidated was a refrigerator manufacturer. <u>Id</u>. Blanket purchase orders and releases were used by Advanced Plastics and White Consolidated to conduct their business. <u>Id</u>. Advanced Plastics would receive a request for a quotation from White Consolidated whenever White Consolidated required parts from Advanced Plastics. <u>Id</u>. The quotation request included the part name, the part number, and an estimate of White Consolidated's yearly usage. <u>Id</u>. Subsequent to a quotation request, Advance Plastics would respond with a price quote. <u>Id</u>. White Consolidated would then submit a blanket purchase order specifying the part but not the quantity, if it elected to purchase parts at the price reflected in Advance Plastics's price quote. <u>Id</u>. Subsequently, White Consolidated would issue individual releases to reference the quantity desired at a given point in time. <u>Id</u>.

SST notes that the facts of <u>Advance Plastics</u> and the instant matter diverge in the following ways (doc. 74). First, the price quotation in <u>Advance Plastics</u> included material and estimated price per unit only (<u>Id</u>.). It did not mention any expected total

-17-

quantity (Id.).  Second, the price quote in Advance Plastics did not mention any of the other detailed terms which were present on the SST's price quotation, including tooling price, just-in-time delivery, delivery terms, part origin, and others (Id.).  These additional details, argues SST, are what led this Court to find that " . . . the terms of the quote [in the instant matter] were sufficient detailed so as to reasonably appear that assent to its terms would create a binding contract" (doc. 49).  As such, SST urges the Court to find Advance Plastics non-binding.

The Court is not persuaded by the holding in Advance Plastics.  In the Court's earlier Order (doc. 49), as noted above, the Court found that SST's price quotation constituted an offer to sell 200,000 castings to Maytag (Id.).  In making that determination, the Court noted the specificity of the price quotation (Id.).  Specifically, the presences of a description of the casting's material, the annual quantity, the estimated weight of each casting, the unit and tooling price as well as detailed delivery terms.  The Court finds that its initial holding should remain.

**CONCLUSION**

Accordingly, the Court hereby DENIES Defendant's Motion for Partial Summary Judgment (doc. 64) and Defendant's Motion for Reconsideration (doc. 73).  The Court does, however,

GRANT Defendant's Motion for a Brief Extension of the Trial Date (doc. 64).  In so doing, the Court hereby SCHEDULES a Final Pre-Trial Conference for May 5, 2005 at 3:00 P.M. and SETS a three-day Jury Trial to begin June 14, 2005 at 9:30 A.M.

       SO ORDERED.


Dated: April 21, 2005       <u>s/S. Arthur Spiegel</u>

                                      S. Arthur Spiegel
                                      United States Senior District Judge